David Breitbart, New York City, for defendant John Pate.

**UNITED STATES of America, Plaintiff,**

v.

**Robert DONOFRIO, Joseph Legrano, aka "Joey Leggs," Joseph Sangiorgio, aka "Lefty," Lawrence Micciolo, aka "Larry Monk," Robert Montano; Richard Alan Brady, Michael P. DeMatteo, Anthony Sayegh, Frank Pontillo, aka "Franky Steel," and John Pate, Defendants.**

No. CR–92–792.

United States District Court, E.D. New York.

March 24, 1993.

### MEMORANDUM AND ORDER

GLASSER, District Judge:

The defendants Montano, Brady, DeMatteo, Pontillo and Pate were convicted after trial and the defendants Donofrio, Legrano, Micciolo, Sangiorgio and Sayegh pleaded guilty to Count One of an indictment which, after describing the structure of the Colombo Organized Crime Family, the internal struggle for leadership of that group and the intensive warfare that followed, charged them as follows:

## COUNT ONE

### Conspiracy to Murder

In or about and between June, 1991 and July, 1992, ... for the purpose of maintaining and increasing their position in the Colombo Family of La Cosa Nostra, an enterprise engaged in Racketeering Activity as defined in Title 18, United States Code, Section 1959(b)(1), ROBERT DONOFRIO, JOSEPH LEGRANO, JOSEPH SANGIORGIO, LAWRENCE MICCIOLO, ROBERT MONTANO, RICHARD ALAN BRADY, MICHAEL P. DEMATTEO, ANTHONY SAYEGH, FRANK PONTILLO, and JOHN PATE, together with others, knowingly and intentionally conspired to murder members of the Orena faction of the Colombo Family in violation of New York Penal Law Sections 125.25 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 *et seq.*)

The plea of guilty was entered immediately prior to the scheduled commencement of the trial. It was agreed among the government and the defendants that an allocution by each that he agreed to murder "an individual," in addition to the other elements of the offense, would suffice. A proposed penalty sheet was prepared by the government and distributed to each defendant; that sheet recited the maximum statutory penalties and projected an offense level of 28 which would result in a sentencing range of 78 to 97 months. Immediately following that projected guideline range was a caveat indicating that the base offense level could be 43 (life imprisonment) under U.S.S.G. § 2A1.5(c)(1). At the time of allocution, the government also stated:

> Finally, I would like to state for the record that all defendants have been advised by their counsel that the guideline range could very well provide for life imprisonment.

(Plea Minutes at 24–25).

The presentence report prepared thereafter set out the following sentencing guidelines analysis and computation:

1. § 2E1.3—*Violent Crimes in Aid of Racketeering Activity*

(a) Base Offense Level (applying the greater):

  (1) 12; or

  (2) the offense level applicable to the underlying crime or racketeering activity.

### Commentary

*Statutory Provision:* 18 U.S.C. § 1959

That guideline (2E1.3(a)(2)) requires a reference to:

2. § 2A1.3—*Conspiracy or Solicitation to Commit Murder*

(a) Base Offense Level: 28

.   .   .   .   .

(c) Cross References

  (1) If the offense resulted in the death of a victim, apply 2A1.1 (First Degree Murder).

3. § 2A1.1—*First Degree Murder*

(a) Base Offense Level: 43

It is important to note that, assuming a criminal history category of I, the sentencing guidelines for offense level 28 is 78–97 months and for offense level 43 is life imprisonment.

The presentence report then proceeds to set out, seriatim, "Criminal Acts" of attempted murders and murder of named persons in which the defendants in a variety of permutations and combinations allegedly participated. That recitation is followed by reference to two other guideline sections.

§ 1B1.2—*Applicable Guidelines*

.   .   .   .   .

(d) A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

§1B1.3—*Relevant Conduct (Factors that Determine the Guideline Range)*

(a) *Chapters Two (Offense Conduct) and Three (Adjustments)*

Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii)

cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1) ...

(B) In the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

Given one murder attributable to one or more members of the conspiracy, every member of the conspiracy and each of these defendants are charged with responsibility for it and assigned an offense level of 43—life imprisonment.

A determination was then made that § *3D1.2—Groups of Closely–Related Counts,* was not applicable because guideline § 2E1.3 is specifically excluded from its scope by § 3D1.2(d) as are §§ 2A1.5 and 2A2.1 and § 3D1.2(a), (b) and (c) are not applicable either.

The Probation Department and the Government then refer to § 3D1.4, which provides in part:

*Determining the Combined Offense Level*

The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | none |
| 1 1/2 | add 1 level |
| 2 | add 2 levels |
| 2 1/2–3 | add 3 levels |
| 3 1/2–5 | add 4 levels |
| More than 5 | add 5 levels. |

In determining the number of Units for purposes of this section:

(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.

(b) Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the highest offense level.

(c) Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level. Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.

If offense level 43 were to be applied then a reference to yet another guideline would have been required, namely, § 5G1.2, as follows:

(c) If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently except to the extent otherwise required by law.

(d) If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently, except to the extent otherwise required by law.

A translation into reality of the foregoing would require the defendants Brady and Pontillo, who elected to stand trial and were convicted of the conspiracy described and of the use of a firearm in the commission of a crime of violence and of conspiracy to collect unlawful debts, to be sentenced to imprisonment for 420 months (35 years) if offense level 43 were applied. Brady is 33 years old, the father of three infants, and Pontillo is 23 years old. There was no evidence adduced at trial that either actually fired a weapon or murdered anyone.

It may be argued that § 3D1.4 should not be applied to those who pleaded for the following reasons:

1. The Introductory Commentary to Part D—Multiple Counts, begins as follows:

This part provides rules for determining a single offense level that encompasses all the *counts of which the defendant is convicted....*

The rules in this Part seek to provide incremental punishment for significant *additional* criminal conduct. The most serious offense is used as a starting point. The other *counts* determine how much to increase the offense level. (Emphasis added).

The captions of the guideline sections in this part read as follows:

3D1.1 Procedure for Determining Offense Level on Multiple *Counts.*

3D1.2 Groups of Closely Related *Counts.*

3D1.3 Offense Level Applicable to Each Group of Closely Related *Counts.*

(Emphasis added). The caption of this Part, namely, *Multiple Counts* and the text of the Introductory Commentary which makes repeated references to Counts (plural) would suggest a draftsman's intent as contemplating a conviction on more than one count. Although that construction would be reasonable if words were given their ordinary meaning, it would be wrong, because it would have overlooked four pages of single-spaced, italicized Commentary and Application Notes to § 3D1.2. Application Note 8 provides:

A defendant may be convicted of conspiring to commit several substantive offenses and also of committing one or more of the substantive offenses. In such cases, treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. *See* § 1B1.2(d) and accompanying commentary. Then apply the ordinary grouping rules to determine the combined offense level based upon the substantive counts of which the defendant is convicted and the various acts cited by the conspiracy count that would constitute behavior of a substantive nature. Example: The defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A. Treat this as if the defendant was convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; and (4) conspiracy to commit offense C. Count (1) and count (2) are grouped together under § 3D1.2(b). Group the remaining counts, including the various acts cited by the conspiracy count that would constitute behavior of a substantive nature, according to the rules in this section.

Unlike the sections which precede it in Part D, § 3D1.4 does not make reference to *Counts.* It refers, instead, to a *Group.* By definition, the word "group" connotes more than one. To assume that that word should be understood in its ordinary sense would be wrong, because it would have overlooked Application Note 7 of the same commentary, which reads:

A single case may result in application of several of the rules in this section. Thus, for example, example (8) in the discussion of subsection (d) involves an application of § 3D1.2(a) followed by an application of § 3D1.2(d). Note also that a Group may consist of a single count; conversely, all counts may form a single Group.

How, then does one arrive at § 3D1.4? That destination is reached by turning back in the Guidelines thicket to §§ 1B1.2(d) and 1B1.3(a)(1)(B), *supra.* Application Note 4 of the Commentary to section 1B1.2(d) would appear to be directly in point and reads in part:

Subsection (d) provides that a *conviction* on a conspiracy count charging conspiracy to commit more than one offense is treated as if the defendant had been *convicted* of a separate conspiracy count for each offense that he conspired to commit. For example, where a *conviction* on a single count of conspiracy establishes that the defendant conspired to commit three robberies, the guidelines are to be applied as if the defendant had been *convicted* on one count of conspiracy to commit the first robbery, one count of conspiracy to commit the second robbery and one count of conspiracy to commit the third robbery. (Emphasis added).

That the theoretician's view of events reflected in Application Note 4 contains within it the seeds of a pragmatic and constitutional nightmare is implicitly recognized in Note 5:

> Particular care must be taken in applying subsection (d) *because there are cases in which the verdict or plea does not establish which offense(s) were the object of the conspiracy.* In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

If, as indicated in Application Note 8, the conspiracy count is to be treated as if it were several counts, each charging conspiracy to commit one of the substantive offenses, the substantive offense must be capable of identification. Here, that would mean identifying the person who a named defendant conspired to murder. Neither Count One nor the pleas to it taken by those defendants who did plead, identified which offenses were the objects of the conspiracy. No person was named as the intended victim of a murder or an attempted murder. As has been indicated, each defendant who pleaded was permitted by agreement between him and the government, to allocute to agreeing to murder "an individual." It is similarly the case that the verdict convicting the defendants who went to trial on Count One did not establish which persons were the intended victims of the conspiracy. Such a determination would have required a special verdict aimed not at conviction, but solely at sentencing and the use of special verdicts is generally not favored. *See, e.g., United States v. Adcock,* 447 F.2d 1337, 1339 (2d Cir.) ("Special verdicts as to a single count are improper and in and of themselves erroneous."), *cert. denied,* 404 U.S. 939, 92 S.Ct. 278, 30 L.Ed.2d 252 (1971); *United States v. Spock,* 416 F.2d 165, 183 (1st Cir.1969); *see also United States v. Todd,* 920 F.2d 399, 407–08 (6th Cir.1990); *United States v. Pforzheimer,* 826 F.2d 200, 205–06 (2d Cir.1987); *United States v. Gallishaw,* 428 F.2d 760, 764–65 (2d Cir.1970) (dictum); *cf. United States v. Murray,* 618 F.2d 892, 895 n. 3 (2d Cir.1980) (upholding use of special verdict to aid in sentencing defendants where conspiracy count contained two objects).

A literal reading of 1B1.3(a)(1)(B) would also support the government's view as to the base offense level to be applied. The difficulty this court finds in the application of 1B1.2(d), it finds here as well. The defendants, charged with a discrete offense, 18 U.S.C. § 1959, at which a specific guideline § 2E1.3, is aimed, find themselves facing sentences for other crimes which are alluded to in the indictment in an undifferentiated way. Those crimes could have been separately charged in separate counts, as separate racketeering acts in a charge under 18 U.S.C. § 1962, or specifically referred to in the introductory paragraphs of the indictment which would then have permitted informed choices both as to pleas and as to defense strategies. This observation echoes those made by the Sentencing Commission in these words:

> The Commission expects the guidelines to have a positive, rationalizing impact upon plea agreements for two reasons. First, the guidelines create a clear, definite expectation in respect to the sentence that a court will impose if a trial takes place. In the event a prosecutor and defense attorney explore the possibility of a negotiated plea, they will no longer work in the dark.

U.S.S.G. Part A—Introduction 4(c), p. 7.

The guidelines did not, in this instance, have either a positive, rationalizing impact or illuminate the area in which laborers in the Kafkaesque world of guidelines worked. One can only speculate, with genuinely deep concern, about the black hole in which a defendant who exercised his constitutional right to proceed *pro se* would work in attempting to predict what his guideline sentence might be—the most significant factor to consider in deciding whether to plead or go to trial. I cannot resist the observation that the penalogical slide-rule exercise described above only peripherally, if at all, considers the human being standing before the sentencing court. That court cannot, ordinarily, take into account the defendant's age, § 5H1.1; his education and vocational skills, § 5H1.2; his mental and emotional condition, § 5H1.3; his physical condition,

§ 5H1.4; his employment record, § 5H1.5; his family ties and responsibilities, § 5H1.6; his community ties, § 5H1.6; his military, civic, charitable or public service and similar prior good works, § 5H1.11. Nor is lack of guidance as a youth and circumstances indicating a disadvantaged upbringing relevant grounds for imposing a sentence, § 5H1.12.

The indictment in this case and the guideline implications which were latently inherent in it is a realization of the Commission's observation that "a sentencing court may control any inappropriate manipulation of the indictment through use of its departure power." U.S.S.G., Part A—Introduction, par. 4, p. 5. This court does not suggest that the government manipulated this indictment. Rather, it is confident in the belief that "manipulation" (for want of a better word) was inadvertent, but justifies nevertheless the use of this court's departure power.

For the reasons indicated, this court finds "that there exists a mitigating circumstance of a kind not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," or in the alternative, recognizes that the invocation of the court's departure power is warranted given the formulation of this indictment. This court therefore departs downward from a level 43 to a level deemed appropriate as to each defendant in accordance with U.S.S.G. § 5K2.0.

SO ORDERED.